**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **SEAN P. BRADSHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | **Division No.:** |
| | ) | **Chapter No.:** |
| **STEEL AND PIPE SUPPLY CO.,** | ) | |
| | ) | **REQUEST FOR JURY TRIAL** |
| **Defendant.** | ) | |

Serve Resident Agent:
Cogency Global Inc.
2101 SW 21st Street
Topeka, KS 66604

## <u>COMPLAINT</u>

COMES NOW Plaintiff, Sean P. Bradshaw, and for his cause of action against the above-named Defendant, alleges and states as follows:

1.     Plaintiff is, and at all times set forth below was, a resident of the State of Kansas.

2.     Defendant is a corporation, organized under the laws of Kansas with its principal place of business in Manhattan, Kansas.

3.     Defendant works in an industry affecting interstate commerce, in that Defendant warehouses, processes, and distributes carbon-steel products to customers throughout the United States utilizing interstate highways.

4.     Defendant employed more than 15 employees in 2020 and does so currently.

5.     Defendant is thus subject to the Americans with Disabilities Act, 42

U.S.C. § 12101 *et seq.*

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Count II of Plaintiff's Complaint arises under the laws of the United States, specifically the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

7.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Count I of Plaintiff's Complaint, as that count is so related to the claims encompassed within Count II as to form one case or controversy.

## FACTS COMMON TO ALL COUNTS

8.      Plaintiff began working for Defendant on or about July 31, 2017.

9.      Plaintiff worked as a Maintenance Technician but occasionally did spot work in Defendant's production department.

10.     On or about October 8, 2019, Plaintiff was filling in for the production department and was instructed to process some metal tubing for distribution.

11.     Plaintiff was required to manipulate pieces of metal tubing using his hands and arms to lift and organize the material so the tubing could be banded together for shipping.

12.     While working in the course and scope of his employment, Plaintiff was lifting and manipulating a piece of steel tubing when he felt a sharp, burning pain in his right shoulder, arm, and elbow.

13.     After experiencing the sharp pain, Plaintiff went to the bathroom to inspect his shoulder, arm, and elbow in the mirror and felt a knot in his upper right arm.

14.     Plaintiff, in accordance with Defendant's injury reporting procedure, reported the work-related injury to his supervisor, the Production Lead, Marshal Hoyt.

15.     Plaintiff then reported his work-related injury to the Plant Manager, Brian Marvel.

16.     Plaintiff then reported his work-related injury to Defendant's Human Resources representative, Ryan Sandberg.

17.     Plaintiff was sent by Defendant to Urgent Care to receive authorized treatment for his work-related injury.

18.     Plaintiff was provided lifting restrictions of no more than 10 pounds by Defendant's authorized treatment provider.

19.     Defendant's authorized treatment provider prescribed physical therapy.

20.     Pursuant to Kansas Workers' Compensation law, the employer controls the medical treatment of employees suffering from work-related injuries.

21.     Plaintiff began physical therapy within the next couple of days and continued physical therapy in accordance with the schedule he was provided by the authorized treatment provider.

22.     On or about October 28, 2019, Plaintiff was evaluated again by Defendant's authorized orthopedic treatment provider.

23.     At that visit, Plaintiff was informed that he had possibly ruptured his biceps tendon.

24.     Having been informed by Defendant's authorized treatment provider of the lasting effects of an unrepaired biceps tendon, Plaintiff insisted on a referral to an orthopedic specialist.

25.     Defendant's authorized treatment provider agreed to refer Plaintiff to an orthopedic specialist.

26.     Plaintiff also received a corticosteroid shot which provided some relief of Plaintiff's pain.

27.     The pain relief which resulted from the corticosteroid shot lasted approximately three weeks from the date Plaintiff received treatment.

28.     On or about November 19, 2019, Plaintiff was evaluated by an authorized orthopedic specialist.

29.     Defendant's authorized orthopedic specialist diagnosed Plaintiff with a ruptured biceps tendon.

30.     The specialist informed Plaintiff that his ruptured biceps tendon had resulted in a distal retraction of the biceps muscle belly.

31.     Plaintiff was informed that, due to the passage of time since the injury, surgical repair of the injury was no longer an option.

32.     Plaintiff was informed that his continued treatment would be in the form of physical therapy.

33.     Plaintiff was provided a 15 pound lifting restriction for his right arm.

34.     Plaintiff continued to work through his right arm pain, performing the essential functions of his job.

35.     Defendant continued to assign Plaintiff tasks which required use of his right arm which exceeded Plaintiff's restrictions.

36.     Plaintiff completed all physical and occupational therapy prescribed by Defendant's authorized treatment provider.

37.     On or about April 23, 2020, Plaintiff, in the course and scope of his employment, was driving a forklift.

38.     While driving the forklift over a raised threshold, two steel items fell from the collection of things Plaintiff was moving with the forklift.

39.     Plaintiff stopped the vehicle, got out, and attempted to pick up the fallen items.

40.     Upon lifting one of the items with his right arm, Plaintiff felt an intense burning pain in the same areas of his right upper extremity, the shoulder, arm, and elbow, which he felt when he suffered the work-related injury on October 8, 2019.

41.     Plaintiff believed this intense pain to be the result of an exacerbation of his October 8, 2019 work-related injury.

42.     Plaintiff completed the task he was doing and immediately reported the injury to his supervisor, Tony Welle

43.     Plaintiff reported the exacerbation of his work-related injury approximately 10 minutes after lifting the steel and feeling the pain.

44.     Plaintiff finished his shift in pain, without incident, and went home.

45.     The following day, on or about Friday, April 24, Plaintiff awoke with intense pain in his right shoulder, arm, and elbow.

46.     Plaintiff went to work for his schedule shift and worked until the daily managers' meeting typically concluded.

47.     In an attempt to reiterate his report of injury, Plaintiff went to Marvel's office.

48.     Marvel was not present in his office, and Plaintiff was unable to find Marvel to reiterate his injury report from the previous day.

49.     Upon information and belief, Marvel was not working that day.

50.     Plaintiff also tried several times to find Sandberg to reiterate his injury report from the previous day.

51.     Each time Plaintiff attempted to find Sandberg, Sandberg was not in his office.

52.     Plaintiff worked through the pain and finished his shift without incident.

53.     Plaintiff was scheduled off for the weekend, April 25 and April 26, 2020, and stayed home to rest his injured shoulder, arm, and elbow.

54.     On or about April 27, 2020, Plaintiff returned to work for his next scheduled shift.

55.     Upon arriving, Plaintiff went to Sandberg's office, encountered Sandberg, and was finally able to reiterate his report of injury to Sandberg.

56.     Plaintiff said to Sandberg, "I know we thought we were done with this injury, but I don't think it is better."

57.     Plaintiff described the increased pain in his right biceps and what Plaintiff was doing when his work-related injury was exacerbated on or about April 23, 2020.

58.     Plaintiff informed Sandberg that Plaintiff had reported his injury to his Lead, Welle, shortly after it occurred, on or about April 23, 2020.

59.     During this conversation with Sandberg, Plaintiff requested treatment for his work-related injury.

60.     Sandberg then told Plaintiff that Marvel would be the one to decide whether Plaintiff would receive treatment.

61.     Plaintiff did not receive any information regarding treatment for his work-related injury on April 27, 2020.

62.     Plaintiff completed his shift in great pain without incident.

63.     On or about April 28, 2020, Plaintiff returned to work at Defendant's facility for his scheduled shift.

64.     Shortly after arriving for his shift, Plaintiff went to Sandberg's office to inquire about the status of Plaintiff's treatment request.

65.     Upon asking Sandberg about the status of Plaintiff's request, Sandberg replied that Marvel was "working on it."

66.     Sandberg continued by explaining that Marvel was trying to figure out what Defendant was "going to do about it."

67.     Confused, Plaintiff said "okay" and returned to his job duties.

68.     Shortly before lunch, Plaintiff encountered Sandberg at the counter by the office area in Defendant's facility.

69.     Sandberg summoned Plaintiff to the counter.

70.     Sandberg handed Plaintiff some paperwork and keys to a company vehicle.

71.     Sandberg told Plaintiff that Plaintiff would be going to Urgent Care.

72.     Believing he was going to Urgent Care to receive treatment, Plaintiff thanked Sandberg and left for Urgent Care.

73.     Upon arriving at Urgent Care, Plaintiff was told that he would not be receiving treatment, but, instead, Plaintiff was there to submit to a drug screen by urine analysis.

74.     After submitting to the drug screen, Plaintiff was told that he needed to go to a second location for further testing.

75.     Plaintiff did as he was instructed and proceeded to the address he was

provided.

76.    Upon arriving, Plaintiff was informed that he was being required by Defendant to submit to an additional, hair follicle drug test.

77.    A lock of Plaintiff's hair was taken, and he was instructed to return to Defendant's facility.

78.    Neither drug test revealed the presence of any drug in Plaintiff's system, as there were none.

79.    Upon returning to Defendant's facility, Plaintiff provided all of the paperwork he had received at the two facilities to Marvel and Sandberg who were standing near each other at the counter area.

80.    While handing the paperwork to Marvel and Sandberg, Plaintiff asked why he was subjected to two drug tests but received no treatment for his work-related injury.

81.    In response, Sandberg chuckled to Marvel uttering something along the lines of "do you want to tell him or should I?"

82.    Marvel replied to Sandberg dismissively, "I don't care, go ahead and tell him."

83.    The two then informed Plaintiff that Plaintiff was drug tested because Plaintiff waited too long to report the April 23, 2020 exacerbation of his work-related injury.

84.    Upset, Plaintiff reiterated how he had followed company policy when he immediately reported the injury to his supervisor Welle.

85.    Plaintiff continued to explain that he had tried to find both Marvel and Sandberg the following day to report the injury, but they were nowhere to be found.

8

86.     Marvel and Sandberg ignored Plaintiff's explanation and told Plaintiff to follow the two men to Marvel's office.

87.     Once in Marvel's office, Plaintiff was told to sit down and was handed two written disciplinary actions.

88.     Plaintiff was given one written disciplinary action for being involved in two workplace accidents in a 12-month period.

89.     The "accidents" which the disciplinary action references are the incidences during which Plaintiff suffered work-related injuries which occurred on or about October 8, 2019 and April 23, 2020.

90.     The written disciplinary action represents that being involved in two workplace "accidents" is a violation of Defendant's policy MSP 4.12.

91.     Plaintiff was also given a written disciplinary action for not reporting his accident in a timely manner.

92.     Plaintiff was given this write up despite reporting his original injury on the day it happened.

93.     Plaintiff was given this write up despite reporting the re-aggravation of his work related injury on the day it happened.

94.     Plaintiff was given a write up despite the work-related injury on October 8, 2019 not being an "accident," as Plaintiff was just lifting piping when he was injured.

95.     Plaintiff was given a write up despite the re-aggravation of his work-related injury on April 23, 2020 not being an "accident," as Plaintiff was just picking something up from the floor.

96.     Plaintiff returned to his job duties and finished his shift without having been

provided any medical treatment.

97.     On or about April 29, 2020, Plaintiff returned to work for his scheduled shift.

98.     Approximately two and a half hours into his shift, Plaintiff was summoned to Marvel's office.

99.     Upon arriving at Marvel's office, Plaintiff encountered Marvel and Sandberg and was instructed to sit down.

100.     Marvel then told Plaintiff that Plaintiff was a "*safety hazard*" to himself and everyone around him.

101.     Marvel then informed Plaintiff that Defendant had decided to discharge Plaintiff, effective immediately.

102.     Plaintiff eventually received treatment in September after hiring a workers' compensation attorney.

103.     Plaintiff's underlying Kansas Workers' Compensation case and authorized treatment are currently ongoing.

104.     All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

105.     On or about September 11, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant engaged in discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

106.    On or about November 5, 2020, the EEOC issued Plaintiff a Notice of Right to Sue and thereby closed the administrative matter associated with the Charge of Discrimination.

107.    Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

## COUNT I - RETALIATION IN VIOLATION OF PUBLIC POLICY
### (KANSAS WORKER'S COMPENSATION ACT)

108.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 107 of his Complaint, as though fully stated herein.

109.    Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

110.    These rights included but are not limited to receiving medical treatment, requesting additional treatment, reporting a work-related injury, and seeking other workers' compensation benefits.

111.    Defendant took adverse actions against Plaintiff, including but not limited to misapplying its own policies to justify formal disciplinary actions against Plaintiff; disciplining Plaintiff pursuant to those policies; refusing to treat Plaintiff's injury; refusing to accommodate Plaintiff's injury; requiring Plaintiff to submit to two drug tests; and discharging Plaintiff from employment.

112.    Defendant directly admits that Plaintiff's work-related injury and request for treatment motivated Defendant to discharge Plaintiff.

113.    The alleged reporting policy used to accomplish Plaintiff's discharge was not accurately applied because Plaintiff reported the exacerbation of his work related injury

the day of the incident, on or about April 23, 2020.

114.    Further, Defendant's policy MSP 4.12 (hereinafter "the Policy"), as described in Plaintiff's write up, is a *per se* violation of Kansas Public Policy in that it is discriminatory against employees who exercise workers' compensation rights.

115.    As evidenced by Plaintiff's written disciplinary action, the Policy was applicable to Plaintiff because Plaintiff suffered and reported two work-related injuries within a 12-month period.

116.    The Policy does not require any "accident," as demonstrated by Plaintiff's two work-related injuries, neither of which were caused any "accident" but instead simply caused by Plaintiff performing assigned tasks.

117.    The Policy, as provided in Plaintiff's written disciplinary action, effectively limits employees to reporting and seeking Kansas workers' compensation benefits for one work-related injury per 12 months, in violation of Kansas public policy.

118.    Defendant's adverse actions taken against Plaintiff were each based upon, and directly related to, Plaintiff exercising his rights granted by the Kansas Worker's Compensation Act.

119.    Defendant's adverse actions against Plaintiff violate State public policy clearly declared by the Kansas Courts and the Kansas Legislature.

120.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

121.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

122.    Thus, an award of punitive and exemplary damages is appropriate.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT II - DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et. seq.*

123.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 122 of his Complaint, as though fully stated herein.

124.    Plaintiff suffered from physical impairments that substantially limited one or more of his major life activities, including but not limited to his ability to work and lift.

125.    Defendant regarded Plaintiff as suffering from a physical impairment and regarded it as limiting Plaintiff from life activities, including the ability to maintain employment, and for limiting Plaintiff from such activities for much longer than they actually did.

126.    In reality, Plaintiff was always able to perform the essential job functions of his former position with reasonable accommodations.

127.    Thus, Plaintiff suffered from a "disability" as defined by 42 U.S.C. § 12102(1).

128.    Defendant took adverse employment actions against Plaintiff, including but not limited to refusing to accommodate Plaintiff's disability; misapplying its own policies to justify disciplinary actions against Plaintiff; disciplining Plaintiff; continuing to assign

Plaintiff tasks which were contraindicated by Defendant's authorized treatment providers' restrictions; and discharging Plaintiff from employment.

129.    A/the motivating in these adverse employment actions was Plaintiff's disability.

130.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

131.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

132.    Thus, an award of punitive and exemplary damages is appropriate.

133.    Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, for attorneys' fees, for punitive damages, and for such other and further consideration and relief as the Court may deem just and equitable.

Respectfully submitted,


 */s/ Daniel L. Doyle*
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, KS  66101
(913) 371-1930, ext. 109
(913) 371-0147  Facsimile
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
**ATTORNEYS FOR PLAINTIFF**